IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ROBIN R. RENAUD**,

    Plaintiff,

vs.                            No.   **CIV 00-1811 MCA/WWD** (ACE)

**EYEMART EXPRESS, INC.**,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant Eyemart Express, Inc.'s Motion for Summary Judgment* [Doc. No. 22] filed on February 28, 2002. Having considered the pleadings and exhibits of record, the relevant law, and otherwise being fully advised in the premises, the Court finds that grounds exist for granting Defendant's motion in part and denying Defendant's motion in part as explained below.

**I.**     **BACKGROUND**

On or about February 24, 1998, Plaintiff filed a charge of discrimination against Defendant with the Equal Opportunity Employment Commission (EEOC), alleging that Defendant subjected her to sexual harassment in the form of a hostile work environment. On or about October 12, 1998, Plaintiff filed a second charge against Defendant with the EEOC, alleging that Defendant unlawfully retaliated against her for filing her first charge of

discrimination. The EEOC issued a right-to-sue letter regarding Plaintiff's retaliation charge on May 18, 1999. The EEOC issued a right-to-sue letter regarding Plaintiff's sexual harassment charge on September 27, 2000. (Compl. ¶¶ 6, 7; Answer ¶¶ 4, 5; Ex. G to Def's Mem. in Supp. of Mot. for Summ. J.) On December 27, 2000, Plaintiff filed a civil action against Defendant alleging sexual harassment and discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e to 2000e-17 (1994 & West Supp. 2002).

Defendant moved for summary judgment on February 28, 2002. For purposes of analyzing Defendant's motion, the evidence submitted with the parties' briefs can be summarized in the light most favorable to Plaintiff as follows.

Defendant is engaged in the business of manufacturing and selling eyeglasses. Defendant operates a store on Carlisle Boulevard in Albuquerque, New Mexico, that has a front retail area where eyeglasses are fitted and sold to the public and a rear lab area where eyeglasses are ground and fitted into frames. (Samuelson Aff. ¶ 2; Goodwin Aff. ¶ 4.)

Plaintiff began her employment with Defendant as a lab technician at Defendant's Carlisle Boulevard store in December 1996. In that capacity, Plaintiff's duties generally included receiving orders from the retail end of the store and working on various stations along the assembly line in the lab area to grind the lenses and complete assembly of the eyeglasses. (Renaud Dep. at 4; Samuelson Aff. ¶ 3.)

Other employees who worked at Defendant's Carlisle Boulevard store while Plaintiff was employed there include Dennis Goodwin, Jo Ann Gunter, Lawrence Garcia, Marc Fenzl, Edward Estrada, Patrick Valencia, Kenneth Miller, Lori Zuni, and Keith Stafford. Ms.

Gunter was the retail manager (Gunter Dep. at 13), and Mr. Stafford also worked in the retail area of the store. (Renaud Dep. at 56.) Ms. Zuni and Messrs. Garcia, Fenzl, Estrada, Valencia, and Miller worked in the lab area. (Renaud Dep. at 5-6, 9; Goodwin Dep. at 12-16; Miller Aff. ¶ 2; Zuni Aff. ¶ 2.)

Mr. Goodwin was the general manager. He was in a position to observe the interaction between the lab employees on a regular basis because he spent about a third of his time in the lab area during the period in question, and his office is located "just in between the lab door and retail." (Goodwin Dep. at 9, 30-31.)

Mr. Garcia was the lab manager until his employment was terminated in or about October 1997. (Renaud Dep. at 5-6, 9; Goodwin Dep. at 12.) Plaintiff had a social relationship with Mr. Garcia that preexisted her employment with Defendant. According to Plaintiff and Mr. Goodwin, Mr. Garcia was dating Plaintiff's sister, and because of this relationship, Plaintiff and Mr. Garcia visited one another and vacationed together at a lake on some occasions. (Renaud Dep. at 19-20, 57-58; Goodwin Dep. at 11-12.) According to Mr. Miller, Plaintiff and Mr. Garcia were dating one another, and Plaintiff was upset when Mr. Garcia's employment as the lab manager was terminated. (Miller Aff. ¶¶ 3, 4.)

Plaintiff claims that Mr. Fenzl became the lab manager and *de facto* supervisor of the lab employees after Mr. Garcia left. (Renaud Dep. at 9-10.) Defendant contends that Mr. Fenzl was simply another lab employee who had no supervisory authority and that no one was hired to replace Mr. Garcia as lab manager while Plaintiff was working there. (Goodwin Dep. at 13-14, 37-40; Gunter Dep. at 14-15; Miller Aff. ¶ 9.) Mr. Goodwin acknowledged,

-3-

however, that he told employees that Mr. Fenzl could probably help them with technical problems in the lab if he was not available. (Goodwin Dep. at 37-38.) Both Mr. Goodwin and Ms. Gunter further acknowledged that Mr. Fenzl was involved in passing out work to co-employees. (Goodwin Dep. at 14; Gunter Dep. at14-15.) In addition, Mr. Miller asserted that he and Mr. Fenzl "were probably the most technically skilled employees in the lab" and "would help out with ordering, answer questions, that type of thing." (Miller Aff. ¶ 9.)

Defendant has a written sexual harassment policy. (Ex. A-2 to Def's Mem. in Supp. of Mot. for Summary J.) Defendant also has submitted affidavits claiming that all employees routinely were given access to this policy when they were hired and that a copy of the policy was posted in the employee break room. (Samuelson Aff. ¶ 8; Goodwin Aff. ¶ 6; Zuni Aff. ¶ 8; Miller Aff. ¶ 10.) In his deposition testimony, however, Mr. Goodwin acknowledged that he probably did not have any specific conversations with Plaintiff regarding Defendant's policy on sex discrimination or harassment when he talked to her at the time she was hired as a lab associate. Mr. Goodwin did not know whether Mr. Garcia had any such conversations with Plaintiff in his capacity as lab manager at the time she was hired. (Goodwin Dep. at 9-10.) Ms. Gunter acknowledged in her deposition testimony that Mr. Goodwin did not go into any specific issues related to discrimination or harassment at the time she was first hired and that she had received no specific training on sexual harassment. (Gunter Dep. at 6, 25-26.) Plaintiff does not recall having any conversations with Mr.

Goodwin or Ms. Gunter about sexual harassment prior to filing her first charge with the EEOC. (Renaud Dep. at 60-61.)

During the period when Mr. Garcia was still employed as lab manager between December 1996 and October 1997, Plaintiff admits that she and her co-workers "were all getting along fine in the lab." (Renaud Dep. at 16.) They socialized together by going out for a drink after work, attending a birthday party in a neighboring eye doctor's office, and attending one or more house parties. On one occasion during this period, Plaintiff went to the home of Mr. Estrada to purchase drugs for a friend. (Renaud Dep. at 16-18.)

According to Plaintiff, her working environment began to change for the worse in October 1997, after Mr. Garcia's employment was terminated. The male lab employees (including Messrs. Fenzl, Estrada, Valencia, and Miller) started "staring and gawking through the window" and "making comments" about female patients or employees in the retail area of the store. These comments included "talking about sex or making comments about women's breasts or their behind, what they would like to do to them sexually." In late October 1997, such comments began to be directed at Plaintiff when Mr. Estrada allegedly said "something to the effect of how he would want to sleep with [Plaintiff] or have sex with [her]." (Renaud Dep. at 7-11.)

Plaintiff also claims that she approached Mr. Fenzl and told him that she and Ms. Zuni "were uncomfortable with the way the men were talking in the back and that [they] didn't want to be put in that position any longer." After making this complaint, Plaintiff was sent home for the day. She claims that when she returned to work the next day, Mr. Estrada

told her that she had "gotten him into trouble" and that Mr. Fenzl had "talked to the guys." (Renaud Dep. at 9-12.) Ms. Zuni denies any involvement in reporting any alleged sexual harassment to Mr. Fenzl. (Zuni Aff. ¶ 6.)

According to Plaintiff, the alleged sexual harassment subsided for a few weeks after she complained to Mr. Fenzl in October 1997, but then it slowly started again with talk about the Jerry Springer television show and the sexual antics that appeared on that program. Soon the topic shifted to personal questions directed at Plaintiff, such as whether she "ever had anal sex" or what her "favorite position" is. (Renaud Dep. at 12-15.)

In the middle of November 1997, Mr. Estrada allegedly resumed his comments about having sex with Plaintiff. (Renaud Dep. at 12-15.) By late December 1997 or early January 1998, the comments became "really graphic, really disgusting," with Mr. Estrada talking about "wanting to bend [Plaintiff] over and lay [her] down on a bed and have sex with [her]." Around January and February 1998, Plaintiff alleges that Mr. Estrada "was coming in with alcohol on his breath" and "trying to look up [her] lab coat." While in the presence of other employees, Mr. Estrada allegedly offered Plaintiff $100 to see her take her clothes off. Plaintiff claims he later grabbed her and tried to force her to kiss him while she was taking a "smoke break" outside the store. She turned her head and avoided the kiss. (Renaud Dep. at 23-26.)

Mr. Estrada also allegedly made graphic comments about other women, including a comment to the effect that a woman's pants were "riding too high on her crotch." (Renaud Dep. at 27.) According to Plaintiff, other male employees also participated in the harassing

comments. For example, Mr. Miller allegedly asked Plaintiff and another female whether they "wanted to go into the bathroom and see his pierced penis," to which Plaintiff responded, "No thank you." (Renaud Dep. at 20-21.) Another male lab employee, possibly Mr. Fenzl, allegedly asked Plaintiff if she was a "carpet muncher" while the male lab employees were talking about an episode of the Jerry Springer Show that involved gay women. (Renaud Dep. at 21-22.) In addition, Mr. Stafford allegedly told Plaintiff: "If I wanted any lip from you, Robin, I would scrape it off my zipper." (Renaud Dep. at 28, 56.)

Plaintiff alleges that such statements were made "on a continuous basis" by several male employees during the period leading up to the filing of her first EEOC charge. (Renaud Dep. at 22, 27.) Defendant does not deny that its employees talked about sex at work during this period; however, Defendant characterizes such talk as innocent sexual banter among friends and claims that Plaintiff was a willing participant who often initiated conversations on this topic. (Samuelson Aff. ¶ 10(b); Miller Aff. ¶¶ 6-8.) Plaintiff denies that she initiated or willingly participated in such conversations. (Renaud Dep. at 15, 68-69.)

Defendant's Senior Vice President, Mary Jo Samuelson, received notice of Plaintiff's first EEOC charge at her office in Dallas, Texas, on February 25, 1998. Ms. Samuelson spoke with the store manager, Mr. Goodwin, the next day and advised him to conduct meetings with all the store's employees about sexual harassment. (Samuelson Aff. ¶¶ 4-9.) Mr. Goodwin promptly conducted the meetings with the employees, including Plaintiff. (Goodwin Dep. at 19-26.) Ms. Gunter also attended some of the meetings while Mr. Goodwin spoke to the employees. (Gunter Dep. at 10.)

After the meetings with the employees, Plaintiff claims that Mr. Estrada started yelling at her and said: "Why are you doing this to me?" (Renaud Dep. at 30-31.) Mr. Goodwin and Ms. Gunter then told Plaintiff to go home for the day, which she did. Plaintiff was given time off from work with pay and did not return to Defendant's Carlisle Boulevard location until two weeks later. During that two-week period, Plaintiff did not speak with any of Defendant's employees except for Ms. Samuelson, who called Plaintiff a couple of times. (Renaud Dep. at 31-34; Goodwin Dep. at 40.)

Defendant points out that Plaintiff never spoke directly with Ms. Samuelson, Mr. Goodwin, or Ms. Gunter about "what she was experiencing" at the store until after she filed the first charge with the EEOC. (Renaud Dep. at 29-30.) Defendant also claims that on March 3, 1998, forms entitled "Notice of Unsatisfactory Performance" were issued to Mr. Estrada and Mr. Valencia regarding an "[a]lleged comment made in the lab concerning female employees and conversations about their love lives or conversations between other associates regarding any sexual induendous [sic]." (Ex. A-3 and A-4 to Def.'s Mem. in Supp. of Mot. for Summ. J.) Mr. Estrada's employment was later terminated for unrelated reasons. (Renaud Dep. at 41; Goodwin Dep. at 35-36.)

Plaintiff claims that when she returned to work in the lab at Defendant's Carlisle Boulevard store in March 1998, additional incidents of sexual harassment occurred. In particular, she testified at her deposition that "[t]he men still continued to do their commenting . . . through the window to the patients or the girls up front," and that she saw Mr. Estrada "doing a sexual motion" to pantomime having sex with a female employee as

she bent over to pull lenses from the lab. She also testified that Mr. Estrada walked around one day with a large plastic tag "right over his crotch." On another occasion when Plaintiff was eating an apple, she claims that Mr. Valencia asked her if he could "nibble all over [her] like [she] was nibbling on the apple." Mr. Fenzl allegedly overheard the remark by Mr. Valencia and brought it to the attention of Ms. Gunter, who told Plaintiff "to stay calm and that she would take care of it." (Renaud Dep. at 35-37.)

Plaintiff claims that she also talked to Mr. Goodwin about the incidents that occurred after she filed her first charge with the EEOC. In particular, she alleges that she asked Mr. Goodwin: "Why can't you make these guys stop? What can I do to make them stop?" Plaintiff alleges Mr. Goodwin answered these questions by asking her: "Why can't people stop smoking?" (Renaud Dep. at 38.) Plaintiff understood this response to mean that "they can't take care of the problem." (Renaud Dep. at 61.)

A few months after Plaintiff returned to work in the lab at Defendant's Carlisle Boulevard store, she claims that Ms. Samuelson called her and "said that their only solution . . . to get [Plaintiff] out of that situation was to move [her] up front." Plaintiff agreed to "go up front" and work in the retail area of the store, despite her reservations that she was not a "people person." According to Plaintiff, the problems continued after she began working in the retail area of the store. Although no further sexual comments were directed at her, she claims that she "still had to deal with the men in the back" and that she "would hear comments" about what other women were wearing or when they would bend over to get lenses. (Renaud Dep. at 38-40.)

After a few additional months of working in the retail area of the store, Plaintiff became further dissatisfied with her treatment by Ms. Gunter and Mr. Goodwin, and she filed the second charge with the EEOC. (Renaud Dep. at 41-42.) The basis for the second charge is that Defendant allegedly retaliated against Plaintiff for filing the first charge with the EEOC. (Renaud Dep. at 62-68.) Plaintiff's employment with Defendant terminated in the middle of October 1998. (Renaud Dep. at 45.)

## II. ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). A fact is "material" if it might affect the outcome of the case. See id. at 248. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party initially must make a *prima facie* showing that summary judgment is appropriate under Fed. R. Civ. P. 56. If the moving party makes such a *prima facie* showing, then the burden of going forward shifts to the non-moving party, who must show

by affidavit or otherwise that a genuine issue of material fact remains for the factfinder to resolve. See Celotex Corp., 477 U.S. at 323.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex Corp., 477 U.S. at 324. Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995). In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); see also Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994) (concluding that parties cannot create material issues of fact by submitting affidavits that contradict their own deposition testimony).

In this case, the parties have submitted affidavits, exhibits, and deposition testimony that contain hearsay and hearsay within hearsay. In reviewing these materials to determine whether Defendant is entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed. See Fed. R. Evid. 801(d)(2). The Court does, however, consider statements attributed to third parties for other admissible purposes. In particular, such statements may be considered for the limited purpose of showing their effect on the

listener (such as the effect of sexually harassing Plaintiff). See generally Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993); see, e.g., Rupp v. Purolator Courier Corp., 45 F.3d 440 (10th Cir. 1994) (unpublished opinion applying this rule in a sexual harassment case). They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements. See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001); see, e.g., Griswold v. Fresenius USA, Inc., 978 F. Supp. 718, 722 (N.D. Ohio 1997) (applying this rule in a sexual harassment case). In very limited circumstances, the type of statements in question may provide circumstantial proof of the knowledge, intent, or state of mind of the declarant. See generally Fed. R. Evid. 803(3); see, e.g., United States v. Joe, 8 F.3d 1488, 1492 (10th Cir. 1993) (applying this rule to a declarant's statement that she was "afraid"); United States v. Freeman, 514 F.2d 1184, 1190 (10th Cir. 1975) (applying this rule to a declarant's statement of future intent to perform an act when the occurrence of that act was at issue).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

In her response to Defendant's summary-judgment motion, Plaintiff requests that the Court grant judgment in her favor as to Defendant's liability. Plaintiff's request does not take the form of a proper cross-motion and will not be considered at this time. See Fed. R. Civ. P. 56(c); D.N.M. LR-Civ. 56, 7.1.

B.     **Plaintiff's Sexual Harassment Claim**

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2002e-2(a)(1). This language has been construed to impose a prohibition on sexual harassment in the workplace, including sexual harassment that takes the form of a hostile work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Not every instance of bothersome or inappropriate behavior with a sexual connotation, however, is deemed to create a hostile work environment that violates Title VII. The standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a "'general civility code'" encompassing the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Further, "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

In order to distinguish such innocuous and ordinary tribulations from the type of discriminatory conditions of employment that are actionable under Title VII, the Supreme Court has developed a two-part test. To pass the first part of this test, the conduct at issue must be "'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" Id. (quoting Harris, 510 U.S. at 21). Under the second part of the test, the conduct at issue must be "one that the victim in fact did perceive to be" hostile or abusive. Faragher, 524 U.S. at 787.

"[T]he objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81 (quoting Harris, 510 U.S. at 23). Careful consideration must be given to "the social context in which particular behavior occurs and is experienced by its target." Id. While "no single factor is required," courts and juries may take into account "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; accord Faragher, 524 U.S. at 787. The "effect on the employee's psychological well-being" also may be a relevant factor, although a plaintiff is not required to prove that she suffered injury or that her psychological well-being was seriously affected in order to prevail on a Title VII claim alleging a hostile or abusive work environment. Harris, 510 U.S. at 22-23.

If an employee's work environment is found to be hostile and abusive under these standards, then the Court must make further inquiries to determine whether the employer is subject to liability for the hostile work environment. "An employer may be liable directly or vicariously. An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment." Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999). "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759 (1998).

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" unless the employer proves the following necessary elements of an affirmative defense by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 765. An employer also may be subject to vicarious liability under this standard "when the harassing employee has apparent authority" over the victimized employee. Wilson v. Muckala, ___ F.3d ___, Nos. 00-5131, 00-5137, 00-5138, 2002 WL 1973940, at *8 (10th Cir. 2002).

In this case, the Court construes Plaintiff's complaint as alleging both direct liability and vicarious liability. Under the theory of direct liability, Plaintiff alleges that Defendant

was negligent in failing to prevent or put a stop to a hostile work environment created by Plaintiff's coworkers. Under the theory of vicarious liability, Plaintiff alleges that Mr. Fenzl, or others with actual or apparent supervisory authority over Plaintiff, were involved in creating a hostile work environment.

Based on the admissible evidence submitted with the parties' briefs, the Court concludes that there are genuine issues of material fact which preclude summary judgment regarding both of these theories of liability. Plaintiff has indicated in her deposition testimony that she in fact perceived the conduct of her male coworkers to be hostile or abusive, and considering all the circumstances, a reasonable jury could conclude from the evidence submitted with the parties' briefs that the alleged conduct was objectively severe or pervasive enough to constitute sexual harassment in the form of a hostile work environment. Viewing the evidence in the light most favorable to the non-movant, the alleged conduct cannot be dismissed as merely an isolated incident of gender-related joking or teasing, and an eyeglass shop is not a place in which conversation among employees about sexual matters or intrusive physical contact can reasonably be considered a legitimate part of an employee's job. See Oncale, 523 U.S. at 81-82.

The allegations that Plaintiff may have engaged in some form of consensual relationship with Mr. Garcia outside of work do not preclude her from bringing a sexual harassment claim in this context. Even assuming the truth of Defendant's unsubstantiated claim that Plaintiff and Mr. Garcia were romantically involved, such involvement did not give Plaintiff's coworkers license to sexually harass her. See Winsor v. Hinckley Dodge,

Inc., 79 F.3d 996, 1001 (10th Cir. 1996). This is so because "'[a] person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment.'" Id. (quoting Katz v. Dole, 709 F.2d 251, 254 (4th Cir. 1983)); see also Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 963 (8th Cir. 1993) (concluding that a plaintiff's "private life, regardless how reprehensible the trier of fact might find it to be, did not provide lawful acquiescence to unwanted sexual advances at her work place by her employer").

Plaintiff's efforts to socialize with her coworkers during the period preceding the alleged sexual harassment also cannot be used to justify that harassment, as there is simply no comparison between the innocuous social activities to which Plaintiff has admitted and the graphic, explicit sexual statements and conduct that allegedly followed. See Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1011 (7th Cir. 1994). A sexual assault is not deemed "less serious just because the perpetrator and the victim began the evening on a 'date.'" United States v. Morgan, 164 F.3d 1235, 1239 (9th Cir. 1999). Similarly, sexual harassment in the form of a hostile or abusive working environment is not deemed less severe just because it is preceded by innocuous social activities of a non-sexual nature.

Further, there are genuine issues of material fact concerning whether Mr. Fenzl participated in the alleged harassment and whether he can be considered a supervisor for the purpose of establishing Defendant's vicarious liability under the theory articulated in Burlington Indus., Inc., 524 U.S. at 765. While Defendant steadfastly maintains that Mr.

Fenzl had no such authority, Plaintiff testified in her deposition that Mr. Fenzl became the lab manager after Mr. Garcia left, and when viewed in the light most favorable to Plaintiff, the evidence concerning Mr. Fenzl's role in the lab reasonably could be viewed as corroborating the claim that he was a *de facto* supervisor in some respects.

Genuine issues of material fact also exist with respect to the degree of care exercised by Defendant in investigating the work environment at its Carlisle Boulevard store and acting to prevent or correct any sexually harassing behavior of which it knew or should have known. Defendant maintains that none of its management-level employees had actual knowledge of Plaintiff's allegations of sexual harassment until after she filed her first charge with the EEOC and that prompt corrective action was taken immediately thereafter. On the other hand, Mr. Goodwin admitted that he was in a position to observe the lab employees' interactions on a regular basis before Plaintiff filed her first charge with the EEOC. In addition, Plaintiff testified that only minimal steps were taken to respond to her complaints of sexual harassment and that the sexually harassing behavior continued after she reported it to Mr. Fenzl, the EEOC, and Mr. Goodwin. This conflict in the evidence is sufficient to preclude summary judgment with respect to the issue of Defendant's negligence under the theory of direct liability recognized by the Tenth Circuit in Baty, 172 F.3d at 1241, and with respect to the affirmative defense available to Defendant under the theory of vicarious liability articulated in Faragher, 524 U.S. at 807, and Burlington Indus., Inc., 524 U.S. at 765.

Resolving the disputed issues listed above will require the factfinder to weigh the evidence and assess the credibility of witnesses. These tasks are beyond the scope of the Court's limited role in ruling on Defendant's summary-judgment motion. See Hunt, 526 U.S. at 551-52. Therefore, at this stage of the litigation, Defendant is not entitled to summary judgment with respect to Plaintiff's sexual harassment claim under Title VII of the Civil Rights Act.

### C.     Plaintiff's Retaliation Claim

The Court reaches a different conclusion with respect to Plaintiff's claim of retaliation (which also may encompass a claim of constructive discharge). According to Plaintiff's deposition testimony, her retaliation claim is distinct from her claim of sexual harassment and forms the basis for a separate charge filed with the EEOC. (Renaud Dep. at 41-42, 53, 62-68.) In its motion for summary judgment, Defendant asserts that Plaintiff is precluded from litigating her claim for retaliation and/or constructive discharge at this point because she did not file suit within the mandatory ninety-day period following the EEOC's issuance of the right-to-sue letter regarding that claim. The Court concludes that Defendant has made a *prima facie* showing that summary judgment as to Plaintiff's retaliation claim is appropriate under Fed. R. Civ. P. 56. See 42 U.S.C. § 2000e-5(f)(1); Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1267 (10th Cir. 1996).

Plaintiff's response to Defendant's motion does not address this issue or controvert any of the allegations of material fact that support it. Therefore, Defendant is entitled to

summary judgment with respect to Plaintiff's retaliation claim because Plaintiff has not met her burden of going forward with respect to that claim.  See Celotex Corp., 477 U.S. at 323.

## III. CONCLUSION

Based upon the undisputed facts, Defendant is entitled to partial summary judgment with regard to Plaintiff's claim of retaliation arising from the second charge she filed with the EEOC on or about October 12, 1998.  Defendant's motion is denied in part, however, with respect to Plaintiff's sexual harassment claim arising from the first charge she filed with the EEOC on or about February 24, 1998, because there remain genuine issues of material fact regarding that claim.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART** with respect to Plaintiff's retaliation claim and **DENIED IN PART** with respect to Plaintiff's sexual harassment claim.

**SO ORDERED**, this 26th day of September, 2002, in Albuquerque, New Mexico.

 

                                                    **M. CHRISTINA ARMIJO**
                                                    United States District Judge